FRANK SALAZAR v. THE STATE.

No. 20452. Delivered June 7, 1939.
Rehearing Denied October 11, 1939.

The opinion states the case.

*Eugene F. Mathis,* of San Angelo, and *C. L. Nunn* and *Zollie C. Stekley, Jr.,* both of Sweetwater, for appellant.

*Truett Barber,* of Colorado City, *Geo. W. Outlaw, District* Attorney, of Sweetwater, *O. C. Fisher,* of San Angelo, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of the murder of Paul Kennedy, and by the jury given the penalty of death.

This offense was alleged to have been committed in Tom Greene County, Texas, and the trial court, on motion of appellant, changed the venue to Nolan County, where this trial was had.

The appellant, a Mexican man, had previously worked for the deceased, on deceased's farm near Miles in Tom Green

County, for two years intermittently, picking cotton and doing some field work. He probably became anamored with the deceased's daughter Wilma, a girl about sixteen years of age, and had at one time been upbraided by the girl's mother for having written a note to Wilma, which Wilma had destroyed There was a barking watch dog that belonged to Mr. Kennedy. Sometime during the night of December 15, 1938, after the father and mother and two younger sisters of Wilma had gone to bed, Wilma, who had stayed up longer than the others in order to complete some school work, went to bed with her sister Imogene, who was ten years old. Sometime after Wilma had gone to sleep she was awakened by the sound of a shot, and she heard the sound of groaning coming from the direction of her mother's room. She jumped out of bed and ran towards her mother's room, and as she reached the door a man, having a gun, grabbed her and told her to hush or she would be killed. This man dragged her out to the garage, and took some cord and tied her hands and feet. This man was the appellant herein. The dog was not in evidence during this time, although the girl was fighting and screaming. Appellant then left her and went back into the house, and she heard some noises from the house while he was there. She asked appellant what he had done and he did not answer her. She begged him to not hurt her parents, and asked to see them, but he answered nothing. He then put her in the family car of the Kennedy's and closed the door, and told her he was going after her clothes, which were located in the mother's room; and she then saw a light shining in the room where her father slept, and where his dead body was afterward found. Appellant soon came back from the house with some bedding and a suit case filled with some clothes of Wilma's. He then gave her some clothes and told her to put them on, and he cut the cords that bound her hands and feet. Appellant then started the car and left with this girl.

Approximately two days thereafter relatives of the deceased found Paul Kennedy lying in his bed in rigor mortis, with a crushed skull, and a hole over his eye, his brain having been macerated, and the skull bones shattered. Evidently his skull had been crushed with some heavy blunt instrument such as an axe, and he had then been shot with a small bore shotgun, some of the wadding from a 410 shotgun being found in the brain structure itself. The mother was also dead and in rigor mortis; the child Imogene had received some kind of blow on the head that had bruised her severely, and had

knocked out some of her upper teeth; the youngest child, Fay, four years old, had a gash over one eye and a skull fracture all over the top of her head. Imogene as well as Wilma identify appellant as the man that was in the house when they were awakened by the sound of the shot, and Imogene heard him tell her sister to "shut-up." She also again identifies him at the bed of the child Fay, after Imogene had jumped in bed with Fay, and relates circumstances showing he was the person who struck her, Imogene, which blow rendered her unconscious.

The testimony shows that appellant had a 410 gauge shotgun rented at the time of this tragedy, and had cartridges therefor. It further shows his flight to Travis County, and his capture there; it shows that he knew where this same shotgun was hidden under appellant's bed; where the deceased's automobile was located in Travis County, and that on appellant's person at the time of his arrest was found the deceased's bill fold. This seems to us to be a complete case of circumstantial evidence, and shows appellant's guilty participation in creating out of this country home a veritable shambles of death.

The appellant complains in bill of exceptions No. 1 of the court's action after having allowed the testimony of Imogene Kennedy, the little girl whose teeth were knocked out while appellant was standing over her in the bed with the four year old child Fay, because this girl was allowed to further testify as follows: "I don't remember anything else until I became conscious on Saturday following this Thursday night. I remember something Saturday when I was on the floor in the dining room. I could see very little because my eyes were swollen. When I ran out and got in bed with Fay my teeth were all right, but when I woke up on Saturday nearly all of my upper teeth were out and they are still out." Such bill also objecting to the fact that the witness was asked to and did stand up before the jury and open her mouth, thus exhibiting the fact of her missing upper teeth. The bill also complains of Dr. Herndon,—who was the physician attending this child on the date of the discovery of the injured and deceased persons at the Kennedy home,—being allowed to testify that he made an examination of this child Imogene and found some of her upper teeth missing. This bill is multifarious and in an ordinary case would not be considered, but in a severe penalty as this one we will proceed to consider the same. Relative to the matter of the loss of the teeth, appellant's objection merely recites

that "There is no evidence that the defendant inflicted any blow capable of producing that." The answer to such an objection is that this witness testified that after she had heard the sound of a shot, and groans coming from her mother's room, she got out of her bed and jumped in the bed with her baby sister. That the appellant came and stood over her and tried to make the baby stop crying; he then "pushed her head down hard," and witness knew nothing else for quite a period of time. We think the inference could properly be drawn that appellant then struck her so hard that she became unconscious. In fact the physician testified that her injuries seemed to be so serious that unconsciousness could have resulted therefrom.

That the gruesome details of this whole transaction are res gestae we have no doubt. It was necessary to resort to circumstances in order to show who killed Paul Kennedy. Art. 1257a of the Penal Code reads, in part, as follows: "In all prosecutions for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the homicide, which may be considered by the jury in determining the punishment to be assessed. * * *"

In 18 Tex. Jur., p. 305, it is said: "The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but the matters immediately antecedent to and having a direct casual connection with it, as well as acts immediately following it and so closely connected with it as to form in reality a part of the occurrence. As part of the res gestae the State may prove the commission of other crimes by the defendant at the same time as the crime charged."

Again in 18 Tex. Jur., p. 77, it is said: "Wherever two or more offenses are so blended or connected with one another that they form an indivisible transaction, evidence of the commission of any or all of them is admissible upon the trial for any offense which is itself a detail of the whole criminal scheme."

The courts uniformly hold that the res gestae of any act is admissible in order to show intent, motive or malice. It was necessary to rely upon circumstances in order to establish not only who committed this act, but also why such act was committed. From the testimony it can be gathered that Paul

Kennedy was asleep when struck over the head with the blunt instrument, and unconscious when shot in the head. His bed clothing were not disturbed; he lay in his bed with the covers up around his neck. He was twice assaulted. Evidently the person assaulting him killed him intentionally with a purpose or motive in view. What was that purpose or motive? Evidently such was to do the very thing appellant did; and that was to possess himself of the person of this girl Wilma. In order to do so, evidently, he had to kill not only Paul Kennedy and his wife, but he had to quiet Imogene and also the baby in order to effect his purpose.

That such acts also evidenced a malicious intent can not be denied. That he intended to achieve his purpose, regardless of how many crimes it was necessary for him to commit, is apparent; and it seems to us to be clear that the proof of such other acts than the killing of Mr. Kennedy was material to show that he had a heart regardless of social duty, and fatally bent on mischief, the existence of which could be inferred from *acts done*, or words spoken. We cite the case of Cernoch v. State, 81 S. W. (2d) 520, wherein the accused was tried for killing H. J. Lindsey; this court held that the killing of Sam Moore at the time, and the shooting at others at the same time was res gestae of the Lindsey transaction.

In the case of Claxton v. State, 4 S. W. (2d) 545, on the appellant's trial for the murder of Otto Junek, it appears that at the same time he also killed Mr. McAlpine and Mrs. McAlpine; the court held that such killings of Mr. and Mrs. McAlpine were also admissible against Claxton. That the crimes were intermixed, grew out of the same transaction, and were contemporaneous, and blended one with another. In the Claxton opinion we find the following:

"Underhill on Criminal Evidence, (3rd Ed.) Sec. 152, lays down the rule applicable here as follows:

" 'If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, either direct or circumstantial, of any one of them cannot be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme.' "

Also see Branch's Penal Code, p. 1285, Sec. 2347, and many cases there cited.

In the late case Carrasco v. State, 95 S. W. (2d) 434, the

accused was tried for the murder of Mrs. Mary Smith. It was proven therein that Carrasco had previously on the same day killed Riley Smith, the husband of Mary Smith; then forced Mrs. Smith to help him carry the body of Riley Smith to their house, and then he killed Mrs. Smith. This court held that these two killings were practically contemporaneous, and so intermixed and blended one with the other as that they formed an indivisible criminal transaction, and the killing of Mr. Smith was admissible in the trial for the killing of Mrs. Smith. There are many other cases holding the same doctrine, and we see no need of further illustration. There is no error shown in the bill.

Bill of exceptions No. 2 relates to the testimony of Earl Kennedy, a brother of the deceased, wherein he testified as to what he found in the home of his brother Paul at the time of the discovery of this crime. It is shown that this was the first person who had discovered and reported the facts relative to this offense, and we think his description of what he there found was properly admitted.

Bill of exceptions No. 3 relates to the testimony of the physician who made a post mortem examination of Mr. Kennedy's body as well as Mrs. Kennedy's body, and his testimony showed that Mrs. Kennedy was shot in the right chest with a 410 gauge shotgun fired at her from four to six feet, in the physician's judgment. Again we think this was admissible. It was shown that Mr. Kennedy was also shot with a 410 gauge shotgun, and it is further of note that the watch dog was also shot, and that appellant had in his possession a 410 gauge shotgun at the time of this killing, and also at the time he was apprehended in Travis County. There is no error evidenced by said bill.

Bill of exceptions No. 4 complains of the testimony of the attending physician as to the wounds found on the head of the child Fay. What we have heretofore said relative to the foregoing bills is applicable here, and decisive of this bill, and it it overruled.

Bill of exceptions No. 5 complains of the testimony of the deputy sheriff White when he was allowed to testify that he went to the home of the deceased on the day of the discovery of the dead bodies, and the bodies were still there, and the body of deceased Paul Kennedy appeared to be in about the same state of discoloration as the body of Mrs. Kennedy. We see no error in allowing such testimony. The facts had already abundantly

shown that they had met their death at practically the same time, and such testimony was probably a shorthand rendition of the facts, it having been previously testified that there was some odor about Mrs. Kennedy's body. Such was but natural, however, as some thirty-six hours or more had elapsed before these bodies were discovered. No error is shown by this bill.

The doctrine of res gestate, as hereinabove outlined, makes pertinent and admissible the whole history of this crime as it was enacted by appellant on the fateful night that he snuffed out the lives of this father and mother, and endeavored to remove the evidence against him surely in order to give free rein to his lust after the sixteen year old girl, Wilma. The verdict, of course, is a severe one, but a merited one, so the jury said, and in the presence of what we deem to have been a fair trial, it does not lie within our province to gainsay the jury's statement as found within their verdict.

The judment is affirmed.

ON APPELLANT'S MOTION FOR REHEARING.

CHRISTIAN, Judge.
After carefully re-examining appellant's contentions in the light of the motion for rehearing, we are constrained to adhere to the conclusion expressed in the original opinion.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.